UNITED STATES of America,
Plaintiff-Appellee,

v.

Lonnie M. BROWN, Robert L. Newsome,
James B. Finney, Julian E. Seymour, Jr.,
and Benjamin Clyde Cranford, Jr., De-
fendants-Appellants.

No. 75–2482.

United States Court of Appeals,
Fifth Circuit.

July 5, 1977.

Rehearing and Rehearing En Banc
Denied Aug. 24, 1977.

S. Phillip Brown, Macon, Ga. (Court-appointed), for Brown.

Frank K. Martin, Columbus, Ga., for Seymour.

Benjamin M. Garland, Macon, Ga. (Court-appointed), for Newsome.

Harry F. Thompson, Macon, Ga., for Cranford.

D. L. Rampey, Jr., Elberton, Ga., for Finney.

Ronald T. Knight, U.S. Atty., O. Hale Almand, Jr., Atty., Macon, Ga., for plaintiff-appellee.

Before GODBOLD and TJOFLAT, Circuit Judges.*

* The Honorable Wade H. McCree, Jr., heard oral argument on this case but did not participate in this decision. This case is being decided by a quorum. *See* 28 U.S.C. § 46(d) (1970).

1. Pub.L. No. 91–452, 84 Stat. 922 (*codified in various sections of 7, 11, 12, 15, 18, 19, 21, 28, 33, 42, 45, 49 & 50 U.S.C.*)

2. Appellants Seymour, Brown and Finney were convicted on all counts; appellant Cranford was acquitted on Count I but convicted on Counts II and III; and appellant Newsome was convicted on Counts I and II. (Newsome was not charged in Count III.)

The sentences imposed were as follows: as to Count I, Seymour, Brown, Finney and Newsome received prison terms of fifteen years, twelve years, twelve years and ten years, respectively, and they received the identical sentences, imposed concurrently, on Count II. Appellant Cranford was sentenced to a twelve year prison term on Count II. On Count III, the district court fashioned the same sentence for the four appellants convicted: "placed on probation for a period of FIVE (5) YEARS, service of said probation sentence to begin this date and continue until such time as the defendant begins the service of sentences of imprisonment imposed this date, and the remain-

TJOFLAT, Circuit Judge:

■ The appellants, former officers of the Macon, Georgia, police department, were charged in a three count indictment with protecting various vice-related activities in violation of several provisions of the Organized Crime Control Act of 1970 (the Act).[1] They were convicted following a jury trial in May 1975.[2] In this appeal, appellants question the validity of the indictment, a variety of procedural and evidentiary rulings, and the final instructions to the jury. To place these issues in proper perspective and to facilitate their analysis, we shall first set forth what the indictment alleged and what the evidence at trial disclosed.

## I. THE INDICTMENT

Count I of the indictment is grounded on 18 U.S.C. § 1962(c) (1970), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

der of the probation time shall begin at such time as the defendant shall have completed the service of the sentences of imprisonment of this date imposed." For a discussion of the propriety of this sentencing, see Part V *infra* at note 43.

As our analysis disposing of this appeal will disclose, the convictions on Count I are valid. See Part III *infra*. As to all appellants except Cranford, the concurrent sentence doctrine would pretermit review of the Count II convictions. *See generally United States v. Strickland,* 509 F.2d 273 (5th Cir. 1975). However, since the jury acquitted Cranford on Count I, we are still called upon to assess the merits of the Count II prosecution as to him. As our conclusion is that his Count II conviction cannot stand, we deem it appropriate to review the merits of the Count II convictions of the remaining appellants, and to set them aside as well. See Part IV *infra*.

Finally, because of our disposition of Cranford's Count II conviction, we must consider his attack on Count III. As we shall point out in Part V *infra*, it, too, must be reversed and with it the convictions of the other appellants charged.

racketeering activity or collection of unlawful debt.

It was alleged that appellants violated this section because, as employees of the City of Macon police department, they knowingly participated in racketeering activities from 1966 through July 1974.[3] The forbidden activities were alleged to have included the solicitation and acceptance of bribes to protect gambling, prostitution and the illicit manufacture, distribution and sale of whiskey in the Macon community.[4]

Count II alleged a violation of 18 U.S.C. § 1962(d) (1970), which provides, "It shall be

unlawful for any person to conspire to violate any of the provisions of [sections 1962(a), (b), or (c)]." It was alleged that appellants, again in their capacity as police officers, conspired to violate section 1962(c) by conducting the affairs of the police department through the pattern of racketeering activities just described.[5] The conspiracy was alleged to have begun at an unknown time prior to October 15, 1970, and to have continued until the return of the indictment on March 25, 1975.

In Count III the appellants and others were charged with violating 18 U.S.C.

---

**3.** The indictment alleged that the police department was an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (1970), which defines the term to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Under section 1961(1), "racketeering activity" is defined as engaging in any one of a number of enumerated offenses, including certain forms of bribery, gambling and moonshining. A "pattern of racketeering activity" is defined in section 1961(5) to mean "at least two acts of racketeering activity, one of which occurred after the effective date of [the Act] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

**4.** Seventeen acts of racketeering were alleged, ten of which were detailed in Count I, seven being incorporated by reference from Count III. The ten were:

(1) From 1966 to 1972 Newsome accepted bribes not to enforce Georgia laws pertaining to the unlawful transportation and sale of alcoholic beverages and the licensing of individuals and establishments selling alcoholic beverages.

(2) From March 1967 to 1970 Finney accepted bribes not to enforce Georgia laws pertaining to the unlawful transportation and sale of alcoholic beverages and the licensing of individuals and establishments selling alcoholic beverages.

(3) From 1968 to May 1974 Finney and Newsome accepted bribes not to enforce Georgia laws pertaining to the licensing of individuals and establishments selling alcoholic beverages.

(4) From 1968 to July 1974 Finney and Newsome accepted bribes not to enforce Georgia laws pertaining to the unlawful transportation and sale of alcoholic beverages and the licensing of individuals and establishments selling alcoholic beverages.

(5) From 1969 to 1970 Newsome accepted bribes not to enforce Georgia laws pertaining to the unlawful transportation and sale of alcoholic beverages and the licensing of individuals and establishments selling alcoholic beverages.

(6) From 1970 to December 1973 Seymour, Cranford, Brown and Finney accepted bribes from William Prentis Tucker not to enforce Georgia laws pertaining to gambling.

(7) During 1971 Seymour and Brown accepted bribes from Guy Allison Odom not to enforce Georgia laws pertaining to prostitution.

(8) From 1971 to 1973 Seymour and Finney accepted bribes not to enforce Georgia laws pertaining to prostitution.

(9) During July 1973 Seymour accepted bribes not to enforce Georgia laws pertaining to gambling and to the licensing of retail liquor establishments.

(10) From August 1973 to December 1973 Seymour, Cranford, Brown and Finney accepted bribes not to enforce Georgia laws pertaining to gambling.

The seven acts incorporated from Count III were:

(1) From October 15, 1970, and prior thereto through December 18, 1973, William Prentis Tucker operated an illegal numbers lottery.

(2) From October 15, 1970, and prior thereto through December 1973, Tucker bribed Seymour.

(3) From October 15, 1970, and prior thereto through December 1973, Tucker bribed Brown.

(4) From October 15, 1970, and prior thereto through December 1973, Tucker bribed Cranford.

(5) Between August and October 1971, Tucker paid Brown $2,500.

(6) On December 18, 1973, Tucker possessed records of his numbers lottery business.

(7) On December 18, 1973, Daisy Bell Hughes possessed $5,000, numbers lottery tickets and other lottery paraphernalia.

**5.** The Count II allegations incorporated by reference the seventeen racketeering activities specified in Count I. Listed as unindicted co-conspirators were thirteen individuals and others unknown. The bill of particulars identified eight additional co-conspirators but indicated that there were more who were still unknown.

§ 1511 (1970) [6] by conspiring to obstruct the enforcement of Georgia criminal law with the intent to facilitate an illegal lottery which was in continuous operation in excess of thirty days and involved over five persons.[7] The conspiracy allegedly began at an unspecified time prior to October 15, 1970, and ended when the indictment was returned.

## II. THE EVIDENCE

The evidence recounted the efforts of the appellants to protect vice-related criminal activity in the Macon community. The first witness, Shirley Dixon, the twenty-six year old daughter of a deceased moonshiner and lottery operator, Talmadge Dixon, set the stage by revealing how her father had been able to operate with police protection from the 1950's until his retirement in 1966. When she was seven or eight years old she would accompany her father on his trips every two or three weeks to the office of the Chief of Detectives, W. A. Bargeron (who committed suicide prior to the indictment), where Dixon's moonshine and lottery operations would be discussed and the Chief would be given an envelope containing from one hundred to six hundred dollars. A similar envelope would be given to appellant Seymour. Ms. Dixon also recalled a visit to a still site in 1961 where her father discussed business with appellants Seymour and Finney.

Shirley Dixon was followed by fifty prosecution witnesses through whom the Government showed the expansion of the protection racket during the 1960's as additional officers became involved and more activities were brought under its umbrella. In the mid-1960's, for example, Bessie Jordan and Thomas Williams began weekly payments to appellants Finney and Newsome to facilitate their moonshine sales. During the same period, James Hughes began paying Seymour so his prostitution business at the Dempsey Hotel could flourish. The protection continued when the business moved to the Central Hotel in 1973 and was extended to cover his involvement in the management of William Prentis Tucker's lottery operation.[8] Tucker paid for protection, not only to Seymour, but also to appellants Brown and Cranford, who had become full participants in the scheme. Other illegal lotteries were allowed to operate at the same time, principally those run by Curtis Zeigler and Rudolph Flanders.

6. Section 1511 provides in part:
 (a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—
 (1) one or more of such persons does any act to effect the object of such a conspiracy;
 (2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and
 (3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.
 (b) As used in this section—
 (1) "illegal gambling business" means a gambling business which—
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

7. Named as principals in the lottery in addition to the appellants charged were William Prentis Tucker, who ran the day to day operations, and Daisy Bell Hughes, the bookkeeper. Seven overt acts were allegedly committed in pursuit of this conspiracy. See note 4 *supra.*

8. See note 7 *supra.* Tucker and his confederates were the subject of a separate indictment, and their convictions on that indictment were affirmed by another panel of this court. *United States v. Tucker,* 526 F.2d 279 (5th Cir.), cert. denied, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976).

In the early 1970's a variety of organized gambling activities began to surface at places such as the Sportsman's Club, the Elk's Club, the Amvets Club, and the Sports Palace. The proprietors there also paid for the privilege of doing business. The slot machines and other gambling devices used at these establishments were manufactured and serviced by two local music companies, which in turn paid a premium to the police officers to stay in operation.[9] Individuals involved in these ventures testified for the Government. Testifying, too, were operators of illicit whiskey outlets and legitimate nightclubs which sold liquor without licenses. Each witness identified one or more of the appellants as the officer he had paid in order to operate free of police interference. Pimps and prostitutes also implicated one or more of the appellants as having received dividends in cash or kind.

The accounts of these vice activities were buttressed by the testimony of several law enforcement officers. Some were former Macon police officers who had actually participated in the pay-off schemes. Others were officers who had either observed pay-offs or had declined offers to join the conspiracy. Still others were officers who had been reprimanded by Chief Bargeron or appellant Seymour for attempting to enforce the vice laws.[10]

The evidence demonstrated how well the appellants succeeded in providing effective protection to vice activity in Macon. The key to the entire operation was the policy instituted by Chief Bargeron and appellant Seymour[11] of leaving vice law enforcement exclusively to the vice squad, where the officers were willing to provide protection. Officers assigned to other details were instructed to pass all information pertaining to vice-related crime to the vice squad. Many who did testified that their information was not acted on and that the activities they reported continued with impunity. Those who disobeyed and attempted to enforce the vice laws were reprimanded. On occasion, when an arrest had been made or contraband seized, Seymour would instruct the officer involved to try to fix the case or to arrange for the return of the contraband.

In sum, the Government's proof established the existence of an extensive protection racket through vice-squad manipulation. It was conceived in the late 1950's, grew during the 1960's, and by the early 1970's embraced a wide variety of activities. The operation was nourished by monetary payments, gifts and sexual favors to the officers, and it continued practically unabated until the federal grand jury investigation which led to the indictment in this case.

## III. THE CONVICTIONS ON COUNT I

Appellants Seymour, Finney, Brown and Newsome claim that their convictions on Count I must be reversed because the indictment is defective in two respects. First, they argue that the indictment fails to charge a crime under section 1962(c) because the Macon police department is not an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) (1970).[12] Second, they claim that section 1962(c) violates the ex post facto clause of the Constitution[13] because it operates in this case to punish the

9. The owners and employees of these companies were indicted separately and convicted. On appeal, their convictions were affirmed. *United States v. Hawes,* 529 F.2d 472 (5th Cir. 1976).

10. One officer, for example, testified that on one occasion he arrested a prostitute who threatened that "if you put your G.D. hands on me Seymour will hear about this and you will be out on the streets." The following day Seymour confronted the officer, ordering him to stay away from the area where he had made the arrest. He added that continued interference with vice squad business would cost him

his job. Other officers related similar encounters following the arrest of prostitutes.

11. During the 1960's Seymour rose rapidly through the ranks, from sergeant to lieutenant and then to captain. The promotions were arranged by Bargeron in order that Seymour could be placed in charge of the vice squad.

12. See note 3 *supra.*

13. U.S.Const. art. I, § 9, cl. 3, states, "No Bill of Attainder or ex post facto Law shall be passed."

appellants for acts they committed prior to the effective date of the Act—October 15, 1970. Appellants also urge reversal of the Count I convictions because of errors in the jury instructions. We will consider each of these contentions in turn.

## A. The Enterprise Issue

18 U.S.C. § 1961(4) (1970) defines enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The thrust of appellants' argument is that this language cannot be construed to encompass a municipal police department. They submit that the statute on its face limits an "enterprise" to entities of a private, commercial nature and to those less formal, private groups which are "associated in fact." If this limitation does not flow from the plain meaning of the words, it is urged, resort to legislative intent should lead this court to a narrowed definition. Appellants point to the congressional hearings which, they claim, give no indication that Congress intended the term to include states, counties, cities or other political entities. Congress is said to have been concerned only with the problems posed by organized crime's attempts to infiltrate and control legitimate businesses and unions.

We are not persuaded by appellants' interpretation of section 1961(4) or their assessment of congressional intent. Initially, it should be observed that the actual language of the statute is very broad, encompassing any "legal entity" and any "group of individuals associated in fact although not a legal entity." It must be conceded at the very least that the Macon police department consists of a group of individuals associated in fact, and it may

well be, although we need not decide, that the department even rises to the level of a "legal entity".[14] Second, appellants' distinction between the public and private sectors has no foundation in the statute. In the definition, individuals and corporations are considered legal entities and, thus, enterprises. An individual, of course, may as easily be a public official as a businessman or union member. Similarly, a corporation may be either a private concern or a public or quasi-public entity such as a municipality or utility. In short, the language is broad enough to include public as well as private entities.[15]

If one does consider the legislative history, however, there is ample evidence to indicate that the congressional focus was not as narrow as appellants claim. The congressional statement of findings and purposes provides in part,

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; . . . (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions *and to subvert and corrupt our democratic processes;* (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, *threaten the domestic security, and undermine the general welfare of the Nation and its citizens* . . .. Organized Crime Control Act of 1970, Pub.L.

---

**14.** The legal status of the Macon police department is not clear from the record. Several city ordinances were introduced into evidence to establish the duties, obligations, rights and privileges of various officers of the police department. Whether the department is an entity created by the municipal charter or is a creature of legislative design cannot be determined from the record.

**15.** Where a statute is plain on its face recourse to legislative history is unnecessary. *See Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) ("the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if it is plain, . . . the sole function of the courts is to enforce it according to its terms").

No.91–452, § 1, 84 Stat. 922 (emphasis added).

The language in finding (3) indicates a concern clearly beyond the infiltration and corruption of legitimate businesses and labor unions by organized crime. Indeed, Congress was concerned with the impact of organized crime on the entire democratic process itself. This concern is further reflected in finding (4), which indicates a congressional awareness of the threat organized crime poses to the domestic security and the general welfare of the country. It would be anomalous for us to recognize this broad congressional statement and yet construe the word "enterprise" to encompass only those entities or groups of individuals within the private sector. Moreover, the narrow construction urged by appellants would also ignore Congress' mandate that "[t]he provisions of this title shall be liberally construed to effectuate its remedial purpose. . . ." *Id.* § 904. In the face of such a clear expression of legislative intent, we can find no justification for limiting the language of section 1961(4) so as to exclude individuals and entities in the public sector.

 Our approach to this definition is in accord with that taken by our court in prior cases. In *United States v. Hawes,* 529 F.2d 472 (5th Cir. 1976), we indicated that the term "enterprise" in section 1961(4) was not to be limited to legitimate businesses, but was to be given a broad interpretation to include the illegitimate as well. Subsequently, we found an enterprise in a group of three individuals who were running rigged card games in Las Vegas and Lake Tahoe hotel rooms. *United States v. Morris,* 532 F.2d 436, 442 (5th Cir. 1976).[16] In sum, we are convinced that the statutory language, the legislative history and the case law compel the conclusion that the Macon police department is an "enterprise" within the meaning of section 1961(4).

### B. The Ex Post Facto Issue

Although the effective date of section 1962(c) was October 15, 1970, the section can be applied by the Government to prosecute anyone who conducted an enterprise through a pattern of racketeering activity having its inception prior to that date. This is because a "pattern of racketeering activity" is deemed to exist if at least two acts of racketeering take place within ten years of each other and at least one of these acts has occurred after the effective date of the Act.[17] Thus, since the last act of racketeering specified in Count I of the indictment was alleged to have occurred in July 1974, the Government was authorized to establish a "pattern of racketeering activity" by showing one or more additional acts of racketeering during the previous ten years. Indeed, the Government charged appellants with conducting the affairs of the

**16.** The inclination of this court to give the term "enterprise" an expansive interpretation is consistent with the attitude taken by other circuit courts as well. *See, e. g., United States v. Parness,* 503 F.2d 430 (2d Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975); *United States v. Cappetto,* 502 F.2d 1351 (7th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). While no other circuit has yet explicitly considered the issue presented here, a district court has held that a public entity is embraced within the section's definition. *United States v. Frumento,* 405 F.Supp. 23, 29–30 (E.D.Pa.1975) (Pennsylvania Department of Revenue's Bureau of Cigarette and Beverage Taxes held to be an "enterprise"). *But see United States v. Mandel,* 415 F.Supp. 997 (D.Md.1976) (State of Maryland held not to be an "enterprise").

It should be noted that there is a general rule of statutory construction that, absent indicia indicating a contrary result, governmental entities are exempt from the operation of "[s]tatutory provisions which are written in such general language as to make them reasonably susceptible to being construed as applicable alike both to the government and to private parties . . . ." 3 C. Sands, *Sutherland Statutory Construction* § 62.01, at 63 (4th ed. 1974). However, "[s]ince the rule is founded on the policy of preserving the interests of government and the public from the *injurious* consequences of a statute, the validity of the rule is destroyed where a statute is advantageous to those interests." *Id.* § 62.02, at 72 (emphasis in original). This exception seems pertinent here, for by bringing governmental entities within the reach of the statute the government and the public enjoy its protection against racketeering.

**17.** See note 3 *supra.*

police department through such a pattern beginning in 1966. It is this type of application of section 1962(c) that appellants contend is proscribed by the ex post facto clause. The Government's response is, as might be expected, that section 1962(c) is saved from the operation of the clause because a conviction cannot be obtained unless it is established that an act of racketeering occurred *after* the section's effective date.

⬛ The Supreme Court has defined an ex post facto law "as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates* a *crime,* or makes it *greater* than it was, when committed.' "[18] It was obviously in an effort to avoid the ex post facto problem that Congress, in defining "pattern of racketeering activity," required that at least one illegal act occur after the effective date of the Act.[19] This feature has quite properly been held to save the statute from running afoul of the ex post facto clause. *United States v. Campanale,* 518 F.2d 352 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). *See also United States v. Wechsler,* 392 F.2d 344 (4th Cir.), *cert. denied,* 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968).

⬛ Here, several acts of racketeering were alleged to have occurred after October 15, 1970, and the jury was specifically in-

structed that to convict it must have been shown that the accused was involved in the commitment of at least one act of racketeering after that date.[20] Thus, we are convinced that Count I did not fall within the proscription of the ex post facto clause.

*C. The Jury Instructions*

⬛ Of the various issues arising from the court's charge on Count I, the most serious is the challenge to the use of the so-called *Holland* charge,[21] which instructs the jury that it has a duty to reconcile, if it can, the testimony of all witnesses so that each shall have spoken the truth. Initially the *Holland* court held that this instruction was reversible error, for it incorrectly stated the jury's duty in assessing testimony and impermissibly invaded the province of the jury as the ultimate fact-finder. On rehearing, however, the court concluded that in viewing the charge as a whole the error was harmless. In reaching this conclusion, the court pointed to the fact that a number of other instructions were given which offset the damage done by the improper instruction. We have since reaffirmed the principle that, where other portions of the instructions cure the error, the conviction will be affirmed. *United States v. McDuffie,* 542 F.2d 236, 239–40 (5th Cir. 1976).

Here the same "duty to reconcile" charge was given verbatim that was given in *Holland;* however, as in *Holland* and *McDuffie,*

**18.** *Bouie v. City of Columbia,* 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) (emphasis in original).

**19.** See note 3 *supra. See also* S.Rep.91–617, 91st Cong., 1st Sess. 158.

**20.** The court charged the jury on Count I that a pattern of racketeering, while it consists of two acts, only gives rise to criminal liability under section 1962(c) if at least one of the acts occurred after the enactment of the statute:
What do we mean by "pattern of racketeering activities"? Pattern of racketeering activities requires at least two acts of racketeering activities. You've got to have at least two acts of rackc_.ering activities, one of which occurred after this law came into effect on October 15, 1970, and the last of which occurred within ten years after the

commission of a prior act of racketeering activity. In other words, there's got to be two acts and one of them must have occurred after October 15, 1970. Both of them could have occurred after October 15, you could have more, but at least one, a minimum of one, must have occurred after October 15, 1970. Record, vol. IX, at 2199–2200.

**21.** *United States v. Holland,* 526 F.2d 284 (5th Cir.), *petition for rehearing granted,* 537 F.2d 821 (5th Cir. 1976). The *Holland* charge was included in the portion of the court's instructions applicable to all the counts. However, it is not necessary for us to determine whether the administration of the charge constituted reversible error as to the Count II and III prosecutions, since we have set aside the convictions on those counts on other grounds.

the jurors were also charged that they were the sole judges of the facts, the weight of the evidence and the credibility of the witnesses and that nothing the court said was intended to interfere with their exclusive responsibility to determine the factual issues in the case. These qualifying instructions, coupled with the overwhelming evidence of guilt, lead us to conclude that, as in *Holland* and *McDuffie,* the error here was harmless.

■ The other challenges to the court's instructions on Count I are without merit,[22] and, as the errors affecting Counts II and III (discussed *infra)* did not prejudice the appellants' trial on Count I, the convictions on Count I are affirmed.

## IV. THE CONVICTIONS ON COUNT II

In the attack on their convictions under Count II of the indictment, appellants once again argue that the charge, as framed, contravened the ex post facto clause. They also claim prejudicial error in the manner in which the trial judge received evidence relating to events which took place prior to the effective date of the Act. While appellants' ex post facto arguments and their evidentiary objections were inartfully made at best, we are convinced that reversible error occurred and that the convictions must be set aside.

### A. The Ex Post Facto Issue

Count II charged a conspiracy to violate section 1962(c). It alleged that the conspiracy was formed at a time prior to October 15, 1970, the effective date of the statute under which the appellants were charged,

and that it continued until the return of the indictment. In addition to this allegation as to the conspiracy's inception, Count II went on to state that an object of the conspiracy was to commit the acts of racketeering specified in Count I[23] and that the appellants in fact committed them. A great number of these acts of racketeering took place between 1966 and October 15, 1970, the date the conspiracy became a federal offense.

Although the appellants moved to dismiss the indictment, claiming that the entire Act violated the ex post facto clause, they did not specifically attack Count II on that ground or question the validity of the retroactive application of section 1962(d). Their motions to dismiss were denied. Thereafter, appellants moved for a bill of particulars to require the Government to state precisely when the conspiracy began and when the respective appellants became members. They also sought a specification of the overt acts the Government would contend at trial were committed in effectuating the scheme. After a conference with the court, the Government filed a brief response, which addressed none of these points. A formal order was never entered disposing of appellants' requests for a bill. Thus, the stage was set for a trial on a conspiracy which began on an unspecified date prior to the time when such conduct became criminal under federal law.

The trial commenced with Count II in this procedural posture, and, as disclosed by our summary of the evidence, the Government presented substantial proof of the conspiracy's existence in the 1960's and the early 1970's. The court then charged the jury as follows:

be corroborated, and on other points of Georgia law. All these contentions were properly rejected by the district court on the basis of our decision in *United States v. Revel,* 493 F.2d 1 (5th Cir. 1974), where it was said that "the reference to state law in the federal statute is for the purpose of defining the *conduct* prohibited" and is not meant to incorporate the state statute of limitations or procedural rules. *Id.* at 3 (emphasis in original).

**23.** See note 4, *supra.*

---

**22.** The appellants raised a number of objections based on Georgia law. Their theory was that, as the term "racketeering activity" is defined in 18 U.S.C. § 1961(1)(A) (1970) to include only those acts "chargeable under State law and punishable by imprisonment for more than one year," one must instruct the jury on the various provisions of state law which would apply if they were being prosecuted in the Georgia courts for the alleged acts of racketeering. Thus, they claim that the jury should have been instructed on the applicable Georgia statute of limitations, on the Georgia requirement that the testimony of an accomplice must

What the evidence in the case must establish beyond a reasonable doubt is that *the alleged conspiracy* was knowingly formed and that one or more of the means or methods described in the indictment were agreed upon to be used in an *effort to effect or accomplish some object or purpose of the conspiracy as charged in the indictment,* and that two or more persons, including one or more of the defendants, were knowingly members of *the conspiracy as charged in the indictment.*

. . . . .

The first thing that you ladies and gentlemen must find beyond a reasonable doubt from the evidence is that *the conspiracy described in the indictment* was willfully formed and was existing *at or about the time alleged.* That's the first thing you must find—that *the conspiracy as described was willfully formed at or about the time alleged. And was existing at or about the time alleged.* Formed and in existence. Record, vol. IX, at 2206, 2208 (emphasis added).

The court went on to instruct the jurors that to obtain a conviction the Government was required to prove that at least one of the overt acts alleged in the indictment had been committed in furtherance of the conspiracy. The jury was not advised, however, of the effective date of section 1962(d). Nor was it cautioned that a verdict of guilty could not be returned unless the Government demonstrated the existence of a conspiracy of which the accused was a member after October 15, 1970.[24] Thus, the appellants were indicted and tried for conduct which occurred several years prior to the enactment of a statute which made it unlawful.

▬▬ Seen in this light, the Count II prosecutions are constitutionally defective. Technically, however, the defect is not rooted in the application of the ex post facto clause. As the Supreme Court recently noted in *Marks v. United States,* 430 U.S. 188,

97 S.Ct. 990, 51 L.Ed.2d 260 (1977), that clause itself only prohibits Congress from enacting legislation retroactively punishing acts which were innocent when done. The principle embodied in the clause is, however, encompassed in the concept of due process and is therefore a limitation on the power of the other two branches of government as well:

The Ex Post Facto Clause is a limitation upon the powers of the legislature, see *Calder v. Bull,* 3 Dall. 385, 1 L.Ed. 648 (1798), and does not of its own force apply to the Judicial Branch of government. *Frank v. Mangum,* 237 U.S. 309, 344, 35 S.Ct. 582, 593, 59 L.Ed. 969 (1915). But the principle on which the clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty. See *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954); *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment. In *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), a case involving the cognate provision of the Fourteenth Amendment, the Court reversed trespass convictions, finding that they rested on an unexpected construction of the state trespass statute by the State Supreme Court:

"[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law such as Art. I, § 10, of the Constitution forbids. . . . If a state legislature is barred by the *Ex Post Facto* clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Id.,* at 353–354, 84 S.Ct., at 1703.

---

**24.** As we have observed in note 20 *supra,* an instruction concerning the effective date of section 1962(c) was given in the court's charge on

Count I. That instruction, however, in no way cured the error we have found in the instructions applicable to the two conspiracy counts.

430 U.S. at 192, 97 S.Ct. at 992–993, 51 L.Ed.2d at 260.

Here the conspiracy provisions of section 1962(d) were applied retroactively in the indictment and the jury instructions, thus allowing appellants to be convicted for "[acts] done before the passing of the law, and which were *innocent* when done."[25] Consequently, appellants' convictions were clearly obtained in violation of the ex post facto principle embodied in the due process clause.[26]

The Government would nevertheless save these convictions because of appellants' failure specifically to raise this due process issue in their pre-trial attack on the validity of Count II and, later, when given an opportunity to object to the court's charge to the jury. Having failed to object, the appellants are said not to be entitled to have the issue noticed on appeal absent "plain error."[27] The Government argues that the showing of prejudice required to demonstrate plain error cannot be made in this case because of certain jury findings implicit in the guilty verdicts returned on Count I. Those verdicts were in response to instructions which required the jury to find at least one post-October 15, 1970, act of racketeering in order to convict. It is urged that jury determinations that each of the convicted appellants engaged in such an act are equivalent to findings that those appellants were involved in the Count II conspiracy after the effective date of the

Act. Consequently, the argument continues, it was harmless error[28] to fail to instruct the jury that an essential element of the section 1962(d) offense is the existence of a conspiracy after that date.

■ The Government argument overlooks the record, for appellants' pre-trial motions claimed that *the indictment* violated the ex post facto and due process clauses. But even if this were not sufficient to present the constitutional issue to the district court and thus to preserve it for appeal, we are convinced that we can notice it under the plain error doctrine.[29] Plain error is that which is "both obvious and substantial." *Sykes v. United States*, 373 F.2d 607, 612 (5th Cir. 1966), *cert. denied*, 386 U.S. 977, 87 S.Ct. 1172, 18 L.Ed.2d 138 (1967). *See also United States v. Meadows*, 523 F.2d 365, 368 n. 5 (5th Cir. 1975), *cert. denied*, 424 U.S. 970, 96 S.Ct. 1469, 47 L.Ed.2d 738 (1976). In determining whether the error is obvious, we are reminded that errors of constitutional magnitude will be noticed more freely under the plain error rule than less serious errors, *see Alexander v. United States*, 390 F.2d 101 (5th Cir. 1968); 3 C. Wright, Federal Practice and Procedure § 856 (1969), and that a closer scrutiny may also be appropriate "when the failure to preserve the precise grounds for error is mitigated by [an objection] on related grounds." *Meadows*, 523 F.2d at 368 n. 3. The error here is certainly of constitutional dimensions. Moreover, if the due

---

**25.** *Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) (emphasis in original).

**26.** Also instructive is *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). In *Mullaney* the Supreme Court unanimously struck down the murder conviction of a defendant where Maine law had placed on him the burden of proving by preponderance of the evidence that he had acted in the heat of passion rather than with premeditation. Relying on *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Court explained that the state had the burden of proving *every* fact necessary to constitute the crime charged beyond a reasonable doubt. The Maine law thus violated due process in shifting the burden to the defendant.

Similarly, in this case the Government was allowed to win its case without proving an

essential element of the offense. It was its duty to prove that a conspiracy existed *after* the effective date of the Act. In the manner in which the case reached the jury, there is no guarantee that such a finding was made. This does not comport with due process.

**27.** *See* Fed.R.Crim.P. 52(b).

**28.** *See id.* 52(a).

**29.** Appellants pressed their ex post facto arguments before us on appeal but did not present the precise grounds on which we now reverse. We may, of course, *sua sponte* notice plain error, *see id.* 52(b); *Silver v. United States*, 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962), and thus we requested supplemental briefs which have now been submitted.

process problem involved in the retroactive application of section 1962(d) was not framed by appellants' pre-trial motions, it was certainly suggested. Under these circumstances we have no difficulty in concluding that the defect in the indictment is sufficiently obvious to meet the plain error test.

We turn, then, to the question of whether the error worked substantial prejudice to the rights of appellants. In appellant Cranford's case the answer is clear. He was acquitted of the Count I charge, so a jury finding that he engaged in a post-October 15, 1970, act of racketeering as a member of a conspiracy cannot be inferred from the verdict. Indeed, if an inference is to be drawn it is that Cranford was not a conspirator after October 15, 1970, and that his conviction on Count II was based on a finding that his complicity in the protection racket took place prior to the effective date of the Act.[30] It is sophistic to say that substantial prejudice did not result in Cranford's case. His Count II conviction must be set aside.

As for the remaining appellants, the implication of a Count I jury finding that each was involved in an act of racketeering after October 15, 1970, does not, as the Government suggests, end the inquiry. The Government must concede that the elements of the offenses charged in Counts I and II differ sharply. The Count I substantive offense required proof that acts of racketeering were committed, or aided and abetted, by the accused; the Count II conspiracy offense did not. Count II, on the other hand, required proof of concerted activity in pursuance of a common object, an element foreign to the Count I prosecution. To be sure, a finding that the alleged acts of racketeering had been committed is consistent with the existence of a conspiracy, but it does not mean that those convicted actually participated in a conspiracy after October 15, 1970, to engage in a pattern of racketeering. For us to draw such a conclusion would be, in effect, to direct a verdict for the Government on a material issue of fact. Such an invasion of the province of the jury cannot be countenanced in a criminal case.[31]

In sum, the indictment was constitutionally deficient, and that basic, underlying defect was not cured by the trial judge in his instructions to the jury. Furthermore, no inference legitimately may be drawn from the Count I guilty verdicts to shore up the conspiracy convictions. Thus, the convictions of all the appellants under Count II must be set aside.

### B. Evidentiary Errors

Although the convictions under Count II are reversible because of due process violations, we deem it appropriate in view of possible retrials to express our opinion on various alleged evidentiary errors. Throughout the course of the trial, evidence of pre-October 15, 1970, conduct and con-

---

**30.** We do not know, of course, what findings the jury may have made in reaching Cranford's verdict on the first two counts. The range of possibilities is practically endless. For example, the jury could have concluded that he had engaged in the conduct charged in Count I but could not agree unanimously on guilt beyond a reasonable doubt. Or they could have found that the Government failed to establish an essential element of that offense, such as the commission of an act of racketeering after October 15, 1970. We can say, however, that the Count I verdict did not establish his involvement in such an act of racketeering.

**31.** See United Broth. of Carpenters & Joiners of America v. United States, 330 U.S. 395, 408–09, 67 S.Ct. 775, 782–83, 91 L.Ed. 973, 985 (1947) ("For a judge may not direct a verdict of guilty no matter how conclusive the evidence. There is no way of knowing here whether the jury's verdict was based on facts within the condemned instructions . . . . A failure to charge correctly is not harmless, since the verdict might have resulted from the incorrect instruction."); United States v. Ragsdale, 438 F.2d 21, 27 (5th Cir.), cert. denied, 403 U.S. 919, 91 S.Ct. 2231, 29 L.Ed.2d 696 (1971) ("This Circuit is firmly committed to what appears to be the universal rule, that no matter how conclusive the evidence, a court may not direct a verdict of guilty in whole or in part. . . . Any such instruction would amount to plain error which would be noticed, even though not assigned."). See also Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

versations was admitted over objection.[32] Many of the conversations were hearsay declarations. We agree with appellants that the district court's handling of much of this proffered evidence was prejudicially improper as to their Count II convictions.

█ We have previously explained in our discussion of the Count I convictions that the Government is permitted under section 1962(c) to prove acts of racketeering taking place before the section's effective date so long as a post-enactment act of racketeering is also proved beyond a reasonable doubt. We have also noted, however, that the elements of the substantive offense of Count I and the conspiratorial offense of Count II differ dramatically in both practical and constitutional dimensions. Thus, while it was proper to allow proof of pre-

enactment conduct into evidence in support of the Count I offense,[33] contemporaneous limiting instructions were required to guide the jury's reception of the evidence as to the conspiracy counts.[34]

█ The trial court's handling of the evidence was most notably deficient in regards to the hearsay declarations (occurring both before and after the effective date of the Act) which the Government argues were admissible under the co-conspirator exception to the hearsay rule.[35] There is no doubt that the co-conspirator exception can be appropriately utilized in cases of this type.[36] For a co-conspirator's out-of-court declaration to be used as evidence against a defendant, however, at some point during the trial the Government must establish by independent evidence that the defendant

---

**32.** It is true that objections were not made by the appellants every time such evidence was introduced. Strenuous objections were lodged, however, early in trial. In light of the district court's handling of the motions to dismiss the indictment and for a bill of particulars, and in light of its treatment of these initial objections by postponing his rulings on admissibility and the deliverance of limiting instructions until later, see note 40 *infra* and accompanying text, we deem the initial objections sufficient to preserve the error on appeal.

**33.** *See United States v. Annoreno,* 460 F.2d 1303, 1307 (7th Cir.), *cert. denied,* 409 U.S. 852, 93 S.Ct. 64, 34 L.Ed.2d 95 (1972); *United States v. Hickey,* 360 F.2d 127, 140 (7th Cir.), *cert. denied,* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966); *Parr v. United States,* 255 F.2d 86 (5th Cir.), *cert. denied,* 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958). *See generally* 3 C. Torcia, Wharton's Criminal Evidence § 642 (13th ed. 1973).

**34.** The need for limiting instructions was even more manifest with respect to the Count III prosecution, where the object of the conspiracy was narrower in scope than the object of the Count II conspiracy. See Part V *infra.*

The complexity of the evidentiary problems presented by this indictment would have made Counts II and III likely candidates for severance. However, motions to sever these counts were never presented to the trial court, and we have not been urged on appeal to find plain error in the trial court's failure to sever them on its own initiative.

**35.** In addition to declarations of co-conspirators, the Government introduced evidence, over defense objection, of individual conduct of appellants and other participants in the protec-

tion racket engaged in long before the effective date of the Act. In the Count II prosecution the evidence is clearly admissible as against the appellant (or appellants) involved to demonstrate, for example, criminal intent or to explain modus operandi, but it was not admissible against appellants not involved in the conduct. In several instances a limiting instruction should have been given to insure that the jury would not consider the evidence in determining the guilt or innocence of those appellants against whom the evidence was not admissible. In the Count III prosecution, the need for limiting instructions was even greater. See note 34 *supra* & Part V *infra.*

In this opinion for convenience sake we will refer to the "co-conspirator exception to the hearsay rule." Under the Federal Rules of Evidence, of course, there is no such exception because a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy is by definition not a hearsay statement. *See* Fed.R.Evid. 801(d)(2)(E). The present case was tried, however, before the Federal Rules came into effect, and at that time a statement such as that defined in Rule 801(d)(2)(E) was often considered to be hearsay but was admissible under "a well-recognized exception to the hearsay rule." *See Anderson v. United States,* 417 U.S. 211, 218, 94 S.Ct. 2253, 2259, 41 L.Ed.2d 20, 28 (1974) (exception referred to as the "hearsay-conspiracy exception").

**36.** *See, e. g., United States v. Marchisio,* 344 F.2d 653, 668 (2d Cir. 1965); *United States v. Dennis,* 183 F.2d 201, 231 (2d Cir. 1950), *aff'd,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

was a member of the conspiracy and that the declaration was made in the course of and in furtherance of the conspiracy.[37]

Moreover, as this case was tried prior to the effective date of the new Federal Rules of Evidence, it was for the jury to decide whether these conditions had been met.[38] In view of the difficulty of this task placed on laymen, this circuit has required a cautionary instruction be given to the jury when evidence is proffered under the co-conspirator exception. In *Apollo*, for example, we noted that there was

> a minimum obligation on the trial judge in a conspiracy case in which extrajudicial statements of alleged co-conspirators are proffered to give a cautionary instruction on the limited uses of hearsay testimony, explaining clearly to the jury the requirement that the conspiracy itself and each defendant's participation in it must be established by independent non-hearsay evidence which must be given either prior to the introduction of any evidence or immediately upon the first instance of such hearsay testimony. 476 F.2d at 163 (emphasis added).

Under this approach, the failure to give such a cautionary instruction at the time the hearsay is first proffered is error, an error which instruction at the end of trial does not necessarily cure.[39] *Id.* at 163–164. *See also United States v. Jackson*, 536 F.2d 628 (5th Cir. 1976); *United States v. Mendez*, 496 F.2d 128 (5th Cir. 1974).

Measured by the *Apollo* standards, the court below committed error for it failed to give a cautionary instruction when hearsay evidence was proffered under the co-conspirator exception. Indeed, when an objection was first raised to such evidence, the court told the jurors that it would instruct them *at the end of the trial* as to the use of such testimony and that until that time they should just "remember everything."[40] This was the court's consistent approach to the problem of co-conspirator hearsay testimony, and consequently no cautionary or limiting instruction was given until the final charge. In the context of this case, such guidance was too little and too late.[41] It is clear that the evidentiary errors were not harmless, but prejudicial, in regard to the Count II convictions.[42]

37. *United States v. Nelson*, 498 F.2d 1247, 1249 (5th Cir. 1974); *United States v. Jimenez*, 496 F.2d 288, 291 (5th Cir. 1974), *cert. denied*, 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660 (1975); *United States v. Apollo*, 476 F.2d 156, 162–163 (5th Cir. 1973). *See generally* 3 C. Torcia, Wharton's Criminal Evidence § 642 (13th ed. 1973).

38. The Federal Rules of Evidence became effective on July 1, 1975, a full month after the conclusion of the trial in this case. It should be noted that the new Rule 104(a) vests the court with the exclusive responsibility of resolving questions of admissibility, except as otherwise provided by Rule 104(b). We pretermit the question of the effect of Rule 104 on our decision in *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973). *See generally United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).

39. The instruction was crucial under the *Apollo* approach because the jury was in effect making the admissibility determination: that is, it was for the jurors to decide by considering the evidence *aliunde* whether the defendant was a member of the conspiracy, and, if they concluded he was, then they could consider subsequent declarations by his co-conspirators which were made out of his presence but in the course and in furtherance of the conspiracy. See note 37 *supra*.

40. The jury was instructed:

> Ladies and gentlemen, the term "conspiracy" is an involved legal terminology, and the subject matter that evidence is involved in. The Court, when we get to the end of the case is going to instruct you ladies and gentlemen on how you can use whatever evidence comes into Court. So just bear that in mind, and you remember everything that you do hear and then I will tell you about it when we get to that point. But presently she may testify to it. Record, vol. II, at 269.

41. The charge only recited the basic law that the defendant had to be shown to be a member of the conspiracy by independent evidence and that the declaration be made in the course of and in furtherance of the conspiracy. As for non-hearsay testimony offered for a limited purpose, no instruction of any kind was given either during the trial, as we have observed, or in the final charge.

42. We should point out here that we have carefully examined each out-of-court statement offered in proof of the Count I offense. Given the broader basis for admissibility afforded by the allegations of that count as compared with the conspiracy counts, we are satisfied that

## V. THE CONVICTIONS ON COUNT III

 The errors which require us to reverse the Count II convictions pervaded the Count III prosecution under 18 U.S.C. § 1511 (1970) as well.[43] Once again the accused were cited for membership in a conspiracy in violation of federal law both before and after such conduct was proscribed by Congress. Count III charged that at some time prior to the effective date of section 1511—October 15, 1970—appellants entered into a conspiracy to obstruct the enforcement of state anti-lottery laws and that they continued their conspiracy until March 25, 1975, when the indictment was returned. In addition to this reference to pre-enactment activity, Count III set forth several overt acts which had their inception prior to October 15, 1970. The principle one described William Prestis Tucker's lottery operation, the illegal gambling business which appellants allegedly sought to protect. Other overt acts alleged frequent bribery payments from Tucker to appellants Seymour, Brown and Cranford to insure the continued operation of the lottery.

As we indicated in our discussion of Count II, appellants' motions to dismiss the indictment were denied. Furthermore, the Government was not required to furnish a bill of particulars fixing the beginning date of the conspiracy and the period of each member's involvement. Consequently, in proving its case the Government was given wide latitude, and a considerable volume of evidence demonstrating the individual involvement of various participants in the protection scheme during the 1960's was received. Much of this evidence, especially the testimony concerning the protection of prostitution and moonshining activities, was entirely irrelevant to the charge framed in Count III of the indictment which dealt only with Tucker's numbers operation, but it was nevertheless received over objection and without limiting instructions.[44] The error was carried forward into the judge's final charge to the jury, where, as with the instructions on Count II, the court failed to advise the jury of the critical importance that should be attached to the date of Octo-

---

each statement offered for the truth of its contents properly fell within a recognized exception to the hearsay rule not requiring the type of limiting instruction mandated by the co-conspirator exception. In addition, these statements, as well as those offered not in proof of their contents, were clearly admissible to establish other facts.

**43.** In addition to the impermissible retrospective prosecution of the section 1511 offense, which required reversal of appellants' convictions, additional error was committed in the court below which, we believe, warrants some comment at this time in order that its possible recurrence may be avoided in the event appellants are retried on the Count III charges. This additional error relates to the manner in which the Count III sentences were fashioned by the trial court. See note 2 *supra*. The maximum sentence provided by section 1511 is five years imprisonment or a $20,000 fine, or both. Each appellant, except Newsome, who was not charged in Count III, received the same disposition—the imposition of sentence was withheld and the appellant was placed on probation for a period of five years. *See* 18 U.S.C. § 3651 (Supp. II 1972). The district judge had the option, of course, of imposing these sentences either concurrently with those handed down on the other counts or consecutively. He apparently attempted to do both. First, he ordered the probationary term to begin immediately and to continue until the imprisonment called for by the Count I and II sentences commenced. Then he provided that upon completion of the prison sentences the appellant would again be placed under the court's supervision for whatever portion of the five year probationary term remained. Under this provision, an appellant, after completing the incarceration and subsequent parole contemplated by the Count I–II sentencing, could be subjected to an additional term of imprisonment if his probation were revoked.

We can find nothing in the federal penal statutes or criminal rules or the case law which would authorize such bifurcation of a probated sentence. We are not persuaded that such authorization is implicit in the power of a district court to impose sentences concurrently or consecutively. We, of course, recognize that a sentencing judge is empowered by Federal Rule of Criminal Procedure 38(a)(4) to place a convicted defendant under active probation supervision while admitted to bail pending appeal, which is evidently what the district judge sought to accomplish in this case. But the rule clearly does not authorize the bifurcated sentence imposed here. We thus conclude that the Count III sentences are illegal.

**44.** See note 32 *supra*.

ber 15, 1970, during their deliberations. Rather, the jury was merely instructed that "the conspiracy as charged in the indictment" must be found to have existed in fact "at or about the time alleged" and that one overt act must have occurred. The Court thus declined once again an opportunity at the conclusion of the trial to avoid the retroactive application of a federal criminal statute and permitted the jury to posit guilt solely on the basis of conduct that did not constitute a federal crime when it was done. As a result, the Count III convictions cannot stand.[45]

## VI. TRIAL MANAGEMENT ISSUES

Appellants have also raised a number of issues relating to a manner in which the trial was conducted. While these issues are largely without merit, we think it is appropriate to address two of them briefly.

### A. The Witness Interview Procedures

The Government had a large number of witnesses in this case. Some of these were individuals who in the recent past had been receiving protection from the appellant officers, and some of them had expressed fear of the appellants. After a lengthy conference in chambers, the court set up a procedure whereby, if the attorneys for the appellants wished to interview any of these witnesses, they could do so only by calling a deputy clerk, who would contact the witness and advise him that he had the right to grant or refuse the interview. If the witness decided to grant an interview, it would be conducted in the presence of the deputy clerk. The court indicated that this procedure was only an experiment and was subject to revision on request. While defense counsel voiced doubts about how practical these procedures were, they never requested any changes in them. Appellants now claim that the witness interview procedures denied them a fair trial.

■■■■■ We reject this contention. As was recently noted by the Sixth Circuit,

"[a] defendant is entitled to have access to any prospective witness although such a right of access may not lead to an actual interview." *United States v. Scott*, 518 F.2d 261, 268 (6th Cir. 1975). The limitation on the right of access is that "a witness may refuse to be interviewed or dictate the circumstances under which he will submit to an interview." *United States v. Dryden*, 423 F.2d 1175, 1177 n. 6 (5th Cir.) *cert. denied*, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970). Here the court simply established a procedure which preserved both the appellants' right of access and the witness's right to grant or refuse the interview. Moreover, the judge made it clear that the procedures were only an experiment, and defense counsel were invited to inform him if the procedures were unmanageable. As appellants failed to come forward with specific suggestions or objections to the procedures, and as the procedures did not infringe appellants' right of access, there was no error.

### B. The Mid-Trial Removal of a Juror

■■■■ At the end of the first week of trial, the court discussed with counsel in chambers the possibility of excusing a female juror who was suffering from nausea and appeared inattentive and indicated that it would rule on the matter following the weekend recess. On Monday morning the court advised counsel that on Friday evening the marshal's office had received a complaint concerning five coffee cups which were missing from the restaurant where the sequestered jurors had dined. The court further advised counsel that it had *sua sponte* ordered the Chief Deputy Marshal to investigate the matter by talking with the other deputies who had personal knowledge of the situation. On the basis of this investigation, the court was able to determine that the same juror who had been sick during the first week had taken the five mugs. It was also brought to the court's attention that the juror had been

---

**45.** Many of the evidentiary errors discussed in regards to the Count II convictions in Part IV B of this opinion were equally prejudicial as to the Count III convictions and serve as further grounds for reversal.

receiving a male juror in her room during the evenings and had been using valium tablets.

On the basis of all this information, the judge advised counsel that he had ordered the juror removed. He also advised counsel that the deputy marshals had retrieved the missing mugs from the removed juror and from another juror who had been given two of the mugs. Appellants objected to the juror's removal but did not request that other jurors be excused. They now claim that it was error for the court to have taken the action it did over the weekend without consulting the parties and that the court should have removed all jurors involved in the misconduct.

While the better practice would have been to have consulted the parties before launching the weekend investigation, we find no error. This is not a case involving a "private communication, contact, or tampering . . . with a juror during a trial about the matter pending before the jury." *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). Nor is this a case where the court secretly received or replied to a communication from the jury. *See, e. g., Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *United States v. McDuffie*, 542 F.2d 236 (5th Cir. 1976). The court's investigation of the matter was limited to questioning the deputy marshals who had knowledge of the situation, and thereafter the court simply exercised its well-recognized discretion when it discharged the juror and substituted an alternate. *See* Fed.R.Crim.P. 24(c); *United States v. Franks*, 511 F.2d 25, 37 (6th Cir. 1975); *United States v. Floyd*, 496 F.2d 982, 990 (2d Cir.), *cert. denied. Miller v. United States*, 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974); *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972). The appellants were fully informed of the court's actions, and their only objection was to the female juror being removed at all. Under these circumstances, there was no error.

## VII. CONCLUSION

In this appeal we have reviewed the convictions of former officers of the Macon, Georgia, police department under the Organized Crime Control Act of 1970. After initially determining that they were engaged in an enterprise comprehended by the Act, we affirmed their convictions for substantive offenses. We were compelled to reverse their convictions under the conspiracy counts, however, because of constitutional, procedural and evidentiary infirmities. Consequently, the convictions under Count I are affirmed, but those under Counts II and III are reversed. This cause is remanded to the district court for proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.