**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Benny Bain SMITH, Defendant-Appellant.**

No. 81–7806.

United States Court of Appeals, Eleventh Circuit.

March 14, 1983.

---

628

Linda Collins Hertz, Linda L. Carroll, Miami, Fla., for defendant-appellant.

William P. Adams, Macon, Ga., for plaintiff-appellee.

Before HENDERSON and HATCHETT, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

The defendant-appellant, Benny Bain Smith, was convicted by a jury in the United States District Court for the Middle District of Georgia on one count of conspiracy to violate the National Firearms Act in violation of 18 U.S.C. § 371 and twelve counts of aiding and abetting the illegal transfer of firearms in violation of 26 U.S.C. § 5861(e)[1] and 18 U.S.C. § 2.[2] On this appeal, the defendant urges that the evidence at trial was insufficient to support his conviction and that certain comments by the prosecutor in closing argument deprived the defendant of a fair trial. The defendant alleges that the trial court's failure *sua sponte* to halt the prosecutor and give curative instructions constituted plain error. After a careful review of the evidence, we affirm the judgment below.

[1] 26 U.S.C. § 5861(e) provides: "It shall be unlawful for any person ... (e) to transfer a firearm in violation of the provisions of the Chapter." The relevant chapter provides for the taxing and licensing of machine guns and destructive devices.

[2] 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

## I. THE SUFFICIENCY OF THE EVIDENCE

### A. *The Evidence*

The defendant was a police officer in Rome, Georgia at all times relevant to this appeal. In this capacity, he developed a substantial expertise with firearms and is, by his own admission, capable of converting semi-automatic weapons to automatic mode.[3]

The investigation of the defendant commenced as the result of information provided by a confidential informant, Avery Almand, to the Rome office of the Bureau of Alcohol, Tobacco and Firearms ("ATF"). The initial focus of the undercover investigation fell on Tommy Camp, an acquaintance of Almand. Camp is a close friend of the defendant's and was eventually indicted as a co-defendant.[4] The government's case against the defendant, based largely on the testimony of ATF agents and tapes of conversations between Camp and ATF agents, is summarized below.

Camp's initial transaction with ATF agents occurred on April 24, 1981, when he sold an automatic weapon to ATF undercover agent Robert F. Finke for $600. On May 7, 1981, Camp sold Finke three more weapons which had been converted from semi-automatic to automatic mode. All three of these weapons, two pistols and a rifle, had previously been sold to Camp in a semi-automatic mode by Carl Gould, owner of the Arsenal Gun Shop ("Arsenal") in Rome. The defendant was seen leaving the Arsenal on May 7 with a rifle similar to the one previously purchased by Camp and sold later that day to Finke. Following the May 7 sale, Camp traveled to the residence of the defendant.

Camp's next meeting with the undercover agents occurred on the night of May 20. Camp departed the meeting at 9:25 p.m., traveled to the defendant's residence, and returned shortly thereafter with an illegally converted automatic weapon. At 10:16 p.m., Camp again departed the meeting, traveled to the defendant's residence, and returned with another converted weapon. The evidence showed that the defendant was at his residence when Camp returned the second time.

The final delivery of weapons from Camp to ATF agents occurred on May 22. At that time, Camp sold the agents 12 automatic weapons for $7200. After the sale, Camp traveled to the defendant's residence.

The defendant was directly linked to three of the guns sold to the agents on the nights of May 20 and 22. The first, the so-called "Brackett weapon," had been purchased by David Brackett from the Arsenal in a semi-automatic mode in late 1980. In mid-May, 1981, Brackett traded the weapon, still in semi-automatic mode, to the defendant for another weapon. The Brackett weapon was sold by Camp to ATF agents as an automatic weapon on May 20.

The other two weapons were sold by Camp on May 22. The defendant purchased the "Martin weapon" in the semi-automatic mode from Sam Martin on May 19, 1981. Three days later, when Camp sold the weapon to ATF agents, the weapon had been converted to automatic.

The "Sexton weapon" was acquired by the defendant in an exchange with fellow police officer Jerry Sexton on May 20. The defendant had sold Sexton an automatic pistol in late 1980 which the defendant had purchased as a semi-automatic from the Arsenal in August, 1980. When the defendant expressed interest in reacquiring the weapon, Sexton agreed to accept another automatic weapon in exchange. The weapon received by Sexton had been purchased by Camp from Pollard's Sporting Goods as a semi-automatic weapon the previous day. The Sexton weapon was included in the twelve gun lot sold to ATF agents two days later.

---

**3.** An automatic weapon is one which can expel more than one bullet by a single pull of the trigger. The weapons are often referred to as "machineguns." The statutory provisions under which the defendant is charged regulate the sale of such weapons.

**4.** Camp was convicted in a separate trial. He did not testify at the defendant's trial.

The government also presented evidence that the defendant helped to finance the purchase by Camp of 10 guns that were eventually sold to ATF agents on May 22. On May 20, Camp purchased ten semi-automatic weapons from the Arsenal for $2,922.40. Since Camp had earlier made a $1300 deposit, a balance of $1622.40 remained to be paid. The evidence showed that on the afternoon of May 20, the defendant borrowed $3,000 in cash from the Rome Bank and Trust on a fifteen day note.

On June 10, Southern Bell, in response to a court order, placed pen registers (devices to record all numbers called from a particular phone) on the telephones of the defendant, the Arsenal, and Colleen Ingraham, Camp's girlfriend. That afternoon, a Southern Bell truck arrived at the defendant's residence while the defendant was home. An ATF agent conducting surveillance heard two people talking, and the truck departed shortly thereafter. After a few minutes, Smith also departed and went to the Arsenal where he remained for about 30 minutes.

Around 8:00 that night, Camp called Avery Almand, the confidential informant, and arranged a meeting. At the meeting two hours later, Camp, still not realizing that Almand was an informant, told Almand that their gun customers were ATF agents and that their phones were tapped.

Realizing that the investigation was unraveling, ATF agents moved to make their arrests. Around midnight on June 10, agents spotted Camp and the defendant together in the defendant's police car. A high speed chase ensued during which the defendant's car was seen traveling with its headlights extinguished. The blue light of the agents' car was activated at one point, but the defendant's car never stopped. The defendant showed up at police headquarters at approximately 2:00 a.m. on June 11 and denied under questioning that he had been with Camp or that he had participated in any type of chase.

Later on the morning of June 11, the defendant traveled to his airplane hangar at the airport. There he was observed re-moving a small black bolt from the side of a weapon and placing the bolt in his pocket. Expert witnesses at trial testified that the weapon had been modified to accommodate an automatic selector switch which would convert the weapon to automatic mode. This weapon had been acquired by the defendant as a semi-automatic from Tony Madlock, a Rome gun dealer, on May 18, 1981. The evidence showed that Camp, rather than the defendant, had made two of the periodic payments on the weapon on April 18 and May 8.

The defendant's presentation at trial consisted almost entirely of testimony by the defendant and his acquaintances. The defendant testified that Camp lived in a small mobile home on the defendant's property and paid monthly rent to the defendant. The defendant urged that this accounted for Camp's frequent trips to the area of the defendant's residence. (Government witnesses testified that Camp listed various addresses as his residence on gun registration forms, but that Camp never listed the defendant's address).

The defendant stated that he was merely acting on behalf of Camp when he acquired the Sexton and Martin weapons. In those instances, stated the defendant, the weapon and cash used to acquire the respective weapons were provided by Camp. The defendant testified that he merely acted as a middle-man and turned the guns over to Camp as soon as he acquired them. The defendant further stated that he sold the Brackett weapon to Camp for $325 shortly after acquiring it. He testified that Camp had informed him that all three weapons were to be raffled off at the Georgia Power plant in New Harley, Georgia.

Evidence was also presented to establish that the $3000 loan acquired by the defendant on May 20 was in fact not received until after Camp completed the purchase of the guns. The evidence showed that the defendant did not leave the bank with the cash until after 3:00 p.m.; Gould, the owner of the Arsenal, testified that Camp had completed the purchase by 2:30 p.m. (However, the UPS employee who delivered the

guns to the Arsenal estimated that the delivery had been made around 3:00 p.m.; therefore, no definite conclusion could be drawn from this evidence). Other evidence was presented to show that the defendant had obtained 19 short-term loans in the five years prior to 1981.

At trial, the defendant asserted that on June 8 he discovered a wire which he assumed to be a telephone tap running from his home to a trailer approximately 400 meters away. He took pictures of the wire which he introduced in evidence at trial. The defendant further claimed that someone removed the wire in the early morning hours of June 10 when the defendant was not home. ATF agents testified that no such wire had ever been utilized in the investigation.

The defendant stated that he had also noticed persons conducting surveillance of his property and concluded that his friend, Camp, must be in some type of trouble. He agreed to meet Camp on the night of June 10, at which time Camp denied having done anything illegal. The defendant agreed to give Camp a ride to Camp's girlfriend's home in his patrol car. As they approached her home, they observed a number of unmarked cars in the street, and Camp purportedly asked the defendant to "get me the hell out of here." The defendant alleged that he drove Camp to a fishing cabin where Camp confessed his illegal activities; the defendant says that he did not know police cars were following him nor did he see a flashing blue light.

Finally, as to the defendant's actions at the hangar the next morning, the defendant stated that he merely used his pocket knife to loosen a pivot pin which was stuck in the gun. While conceding that Camp made two of the periodic payments on the gun, the defendant stated that he had asked Camp to apply some of the rent Camp owed him to the purchase price of the gun.

### B. Was the Evidence Sufficient?

An appellate court considering the sufficiency of the evidence in support of a criminal conviction must view the facts and draw all reasonable inferences therefrom in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Davis, 679 F.2d 845, 852 (11th Cir.1982); furthermore, all credibility choices must be made in favor of the finder of fact. United States v. Gianni, 678 F.2d 956, 958–9 (11th Cir.1982). Interpreting the evidence in this manner, the applicable standard of review is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir.1982) (en banc).

In order to establish a defendant's participation in an illegal conspiracy, the government need not prove that a defendant knew every essential detail of the conspiracy or participated in every action in furtherance of the conspiracy; it is enough for the government to show that the defendant knew of the essential objective of the conspiracy and participated in helping to accomplish that objective. United States v. Watson, 669 F.2d 1374, 1379–80 (11th Cir.1982); United States v. Davis, 666 F.2d 195, 201 (5th Cir., Unit B 1982). The existence of an agreement and the cooperation of the defendant may be proved by circumstantial evidence, such as "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Lee, 694 F.2d 649, 652 (11th Cir.1983), quoting United States v. Spradlen, 662 F.2d 724, 727 (11th Cir.1981).

The 12 non-conspiratorial counts from which the defendant was convicted charged that he aided and abetted his co-conspirator in the illegal sale of automatic weapons. To convict for aiding and abetting, the government must prove that the defendant desired his association with the illegal activity and sought by his actions to make it succeed. United States v. Long, 674 F.2d 848, 854 (11th Cir.1982); United States v. Schwartz, 666 F.2d 461, 463 (11th Cir.1982). These essential elements may be proved by circumstantial as well as direct evidence. United States v. Garza, 531 F.2d

309, 311 (5th Cir.), *cert. denied,* 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976). Although evidence of "presence" or "flight" is not alone enough to sustain a conviction, such evidence coupled with other evidence of guilt may provide adequate grounds for a conviction. *United States v. Bryant,* 671 F.2d 450, 454 (11th Cir.1982).

 ▌ Applying these principles to the evidence before us, we have no doubt that the evidence was sufficient to support the conviction of the defendant for conspiring to violate the National Firearms Act and for aiding and abetting in several violations of that Act. Though the government ties the defendant to only three weapons directly, the inference apparently drawn by the jury that the defendant was the "craftsman" who converted weapons for resale was clearly permissible and well within the range allowed to a reasonable factfinder. Moreover, the jury's deliberations undoubtedly required a careful evaluation of the credibility of various witnesses in the trial, a task uniquely suited to an impartial factfinder whose decision we are bound to respect. *Gianni,* 678 F.2d at 959; *United States v. Black,* 497 F.2d 1039, 1041 (5th Cir.1974). The jury's apparent conclusion that the defendant was not being fully truthful no doubt contributed significantly to the guilty verdict.

## II. THE PROSECUTOR'S CLOSING ARGUMENT

 ▌ The defendant objects for the first time on this appeal to certain comments made by the prosecution in its closing argument. Since the defendant failed to object at trial, we may only consider whether the comments prejudiced the defendant if we find that the trial court committed a "plain error" in failing *sua sponte* to reprimand

the prosecutor and issue a curative instruction. Fed.R.Cr.P. 52.[5] We are unable to conclude that the trial court's failure to act constituted plain error.

 ▌ A plain error is one which is "both obvious and substantial." *United States v. Brown,* 555 F.2d 407, 420 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *Sykes v. United States,* 373 F.2d 607, 612 (5th Cir.1966), *cert. denied,* 386 U.S. 977, 87 S.Ct. 1172, 18 L.Ed.2d 138 (1967). Errors of a constitutional magnitude will be more freely noticed under the plain error rule than errors of a lesser degree. *Brown,* 555 F.2d at 420.

The majority of the allegedly prejudicial comments made by the prosecutor were simply permissible inferences to be drawn from the evidence.[6] The prosecutor in no way implied that his conclusions were based on knowledge outside of the record nor did he inject extrinsic or prejudicial matters that had no basis in the evidence. As this Court noted in *United States v. Morris,* 568 F.2d 396 (5th Cir.1978):

[A lawyer in closing argument has the] right to state his contention as to the conclusions that the jury should draw from the evidence. Therefore, an attorney's statements that indicate his opinion or knowledge of the case as therefore presented before the court and jury are permissible if the attorney makes it clear that the conclusions he is urging are the conclusions to be drawn from the evidence.

*Id.* at 401.

However, two of the prosecutor's comments merit closer scrutiny. First, the prosecutor's statement that one of the government's expert witnesses, Chuck Lanham, had no reason to lie[7] appears at first

---

**5.** Rule 52 provides:
 (a) *Harmless Error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.
 (b) *Plain Error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

**6.** These comments included allegations that the defendant was not telling the truth and that defendant had fabricated evidence.

**7.** The prosecutor stated:
 You have Chuck Lanham who came here and testified. He test fired that gun with the switch in it and it fired automatic. Why should I bring in rebuttal to something about

glance to violate the well-established rule that a prosecutor may not personally vouch for the credibility of government witnesses. *United States v. Phillips,* 664 F.2d 971, 1030 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Garza,* 608 F.2d 659, 663 (5th Cir.1979). However, this Court has recognized an exception to this prohibition, the so-called "fair response" rule, that entitles a prosecutor to respond to arguments advanced by defense counsel in his or her statement to the jury. *United States v. Hiett,* 581 F.2d 1199, 1204 (5th Cir.1978). We must therefore consider whether the prosecutor's comments were responsive to remarks previously made by defense counsel.

■ Chuck Lanham was an ATF expert from Washington who testified that the weapon recovered from the defendant at the airplane hangar on the day of his arrest had been altered so that it could fire in automatic mode by the insertion of an automatic selector switch. Lanham also testified that he had inserted such a switch and fired the weapon in the automatic mode. In closing argument, defense counsel implied that Lanham himself had converted the weapon to automatic by the insertion of the switch and then sent the weapon on to Washington for inspection by government expert witnesses.[8] In these circumstances, the prosecutor's statement that his witness had no incentive to be untruthful clearly constituted a "fair response" to the defense counsel's comments.

Second, the defendant objects to the prosecutor's implication that the defendant was personally involved in importing narcotics into the United States.[9] This remark stemmed from a comment during trial by ATF undercover agent Marshall Reece that, when purchasing weapons from Camp, he had posed as a person importing drugs from South America in exchange for illegal weapons. There was no evidence that Camp had informed the defendant of this comment by Reece, yet defense counsel failed to object and the statement was entered into evidence.

■ Though the trial court may have been bound to give a curative instruction if the defendant had objected to the prosecutor's statement at trial,[10] we do not find that the prosecutor's misstatement of the evidence rises to the level of a plain error. First, the prejudice alleged by the defendant is not of a constitutional magnitude and thus the defendant carries a slightly heavier burden in persuading this Court that the error was "obvious and substantial." Second, and most important, the trial court's charge to the jurors reminded them that they were the "sole judges of the facts" and that statements made by the lawyers in opening and closing arguments were not evidence in the case. "It is no ground for reversal that a prosecutor misstates the evidence, where no objection is

---

that. My expert, this man from Washington, who test fired that weapon, said it fired automatic. Why would he lie about that? We're not in the business of doing that kind of thing, lies of that nature. This is not the way it works. He test fired the gun and it did fire automatic.
(4–R 60–61).

8. The defense counsel stated:
   Do you remember the man that got up here that testified from Maryland and said I checked this weapon, I checked it and the tool markings on it were consistent with an automatic selector being put in here and then lo and behold we found out that the ATF agent put one in there and fired it and then sent it to Maryland. How about that? Sure it had a selector in there because they put it there.

(4–R 44).

9. The prosecutor stated:
   This is our one man S.W.A.T. team you recall. There is some irony in that. He is trying to tell you that these weapons were used in law enforcement and he out there distributing, gun running down to South America to bring dope back into the United States. It is ironic.
   (4–R 56).

10. We do not reach the question, not raised by the government, whether such evidence would have been admissible against Smith, and therefore properly the subject of counsel's argument, because of the sufficient proof for the jury to find that Smith and Camp were co-conspirators in negotiating with Agent Reece.

made and the jurors were properly instructed that they are to rely on their own recollection of the evidence." *United States v. Bizzard,* 674 F.2d 1382, 1389 (11th Cir.1982).

AFFIRMED.