UNITED STATES of America, Plaintiff-Appellee,

v.

Kenneth D. KROESSER, Roger D. Harmon, Defendants-Appellants.

No. 82–3095.

United States Court of Appeals, Eleventh Circuit.

May 11, 1984.

Opinion on Denial of Rehearing Aug. 1, 1984.

Mark L. Horwitz, Orlando, Fla., for defendants-appellants.

Donald E. Christopher, Asst. U.S. Atty., Orlando, Fla., Louis M. Fischer, Atty. Appellate Sect., Crim. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before TJOFLAT and FAY, Circuit Judges, and WISDOM *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Roger Harmon and Kenneth Kroesser, former employees of the United States Bu-reau of Engraving and Printing, appeal their convictions, following trial by jury, for the crime of retaining and concealing Federal Reserve notes stolen from the Bureau of Engraving and Printing. We find no reversible error, and accordingly affirm.

## I.

Prior to their commission of the crime charged in this case, Roger Harmon and Kenneth Kroesser were both employed by the Bureau in Washington, D.C., as Physical Security Specialists. One of their job assignments was to witness the destruction of sheets of Federal Reserve Notes that had been removed from production runs in order to spot check for blemished bills.[1] On several occasions, beginning in the fall of 1977, Harmon and Kroesser hid some of the sheets while the workers whose job it was to destroy them were out to lunch. Then, after work, they would retrieve the hidden sheets, conceal them under their clothing, and leave the premises. Each sheet contained sixteen Federal Reserve Notes. The currency consisted primarily of twenty dollar bills but also included large amounts of $50's and $100's. Kroesser estimated that he and Harmon had stolen currency with a face value of at least $750,000, a stack of sheets between four and five inches high, by 1979, when they resigned from the Bureau. They disposed of none of this currency, however. Rather, they secreted it in a safe in Kroesser's home in Virginia.

After they resigned from the Bureau, Harmon and Kroesser moved with their families to Sanford, Florida, and became partners in a saloon. They brought Kroesser's safe, and the currency, with them to Sanford and kept it in a bedroom in Harmon's house. After they arrived in Florida, the currency was disposed of and se-

---

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Approximately 90% of the bills on these sheets would not be blemished. However, once the sheets were removed from the production run it was apparently cheaper to destroy and replace them than to reinsert them into the production run.

creted in a variety of ways. Some, perhaps as much as $16,000, was spent directly by Harmon and Kroesser; a large amount was stored in the safe in Harmon's house; a small amount was stored in a strongbox in a closet in Kroesser's apartment in Sanford; and the largest part of the currency was sent abroad in a "laundering" operation.

In mid-April of 1982 Harmon's elder son, Doug, stole the safe Kroesser kept at Harmon's house, and along with two accomplices blew it open. Harmon ultimately succeeded in recovering approximately $20,000 of the stolen currency from his son, which he returned to Kroesser, though an additional $40,000 was apparently taken by the accomplices.

Harmon and Kroesser were concerned about being detected if they passed too much of the money themselves.[2] Kroesser eventually discussed their concern with Denny Pennell, whom he met when he and Harmon acquired the saloon; he told Pennell that he had a large quantity of stolen currency that he wished to launder. Denny introduced Kroesser to his father, Jack Pennell of Fort Myers, Florida, a reputed organized crime figure. An arrangement was made in which Kroesser delivered $200,000 in currency to Jack Pennell at his home, and the money was disposed of abroad. Several months later Kroesser and Harmon each received $40,000 and Denny Pennell received $12,000 from Jack Pennell's Orlando attorney, Mark Cooper.[3] Kroesser subsequently delivered $300,000 of the stolen currency to Jack Pennell to be laundered in the same fashion. Kroesser and Harmon never received payment from Pennell for this batch of currency, however.

Kroesser's involvement with the stolen currency eventually caused his marriage to break up; his wife divorced him. Following the divorce, Kroesser became romantically involved with Cynthia Queen. Queen shared Kroesser's apartment in Sanford. One day early in March 1982, while cleaning, Queen discovered, and after searching for and finding a key, opened, the locked strongbox in Kroesser's closet. Inside she found $20, $50 and $100 Federal Reserve Notes both cut and in uncut sheets. Several days later at a restaurant Queen told Kroesser of her discovery. Kroesser, visibly upset, left the restaurant. Queen followed, joining him in the parking lot. Kroesser lost his temper; he beat her and admonished her not to mention the currency again. Kroesser later confessed to Queen that he and Harmon had stolen the money while employed at the Bureau of Engraving and Printing.

**2.** The currency was facially perfect. The only way the bogus nature of the notes could have been discovered would have been if Department of the Treasury personnel were alerted to the possibility that the currency was not legitimate. They could have determined whether it had been issued by the Department by looking for the serial numbers of the bills on the Sheet Exchange Record, which shows the disposition of all currency printed by the Bureau of Engraving and Printing.

Though the arrests in the instant case were the result of information garnered from sources totally independent of the Bureau of Engraving and Printing, nonetheless two days prior to the arrest of Kroesser and Harmon the Bureau became independently aware that some currency which should have been destroyed had entered circulation. The currency in question surfaced after it was used to purchase postal money orders in the Orlando, Florida, area. The currency aroused suspicion, because, although the printing and paper were genuine in every re-

spect, the bills had uneven edges, as though they had been cut with scissors. Federal Reserve Notes are not generally perfectly centered and that alone would not have aroused suspicion.

The only other fact that would have made these notes suspect is their serial numbers. Many of the bills had serial numbers ending with 9998, 9999 and 0000. Currency sheets which have notes with serial numbers ending with 9999 and 0000 are usually extracted from the process and checked for quality and correctness, and are replaced by substitute sheets with serial numbers ending with an asterisk and placed into circulation. In addition, other sheets on which defects are spotted by chance are removed from the process. The sheets that are removed are subsequently identified on the Sheet Exchange Record and scheduled for destruction.

**3.** Cooper was apparently unaware of the source of these funds.

Shortly after the beating Queen was visited by her father who was disturbed by her bruises. Queen told her father about the money and showed it to him. At her father's urging, Queen took several sheets of the notes to protect herself against Kroesser. She locked these sheets in the trunk of her car, and she also told her father of the names of the other persons Kroesser had said were involved.

On April 26 Kroesser struck Queen again. She went to the police and attempted to have him arrested for battery. The arrest could not be immediately effected because the offense was a misdemeanor and required the approval of the State's Attorney's Office. The next day Kroesser moved out of the apartment, transferring the strong box and his belongings to a Winnebago motor home, without informing Queen where he was going. He took the Winnebago to a local campground. That night Queen again went to the Sanford police and requested Kroesser's arrest for beating her. When it was explained that an immediate arrest could not be made, she told the police about the uncut sheets of currency she had taken from Kroesser. The police, led by Detective Ray Bronson, met Queen in the parking lot of her apartment complex, where she gave them the currency she had hidden in the trunk of her car. The police then contacted the Secret Service.

At the suggestion of the Secret Service, the police obtained the approval of the Assistant State Attorney to charge Kroesser with aggravated assault. On April 28, shortly before 2:00 a.m., they arrested him at his tavern. The arresting officers informed Kroesser that he was being arrested for assaulting Queen; they did not inform Kroesser of their knowledge of the stolen currency. They read Kroesser his *Miranda* rights; he responded that he didn't want to speak about the assault without an attorney. Later, at the police station, in response to a Secret Service request the officers attempted to find out the location of Kroesser's motor home. Detective Bronson, employing a ruse, told Kroesser that an unidentified Winnebago had been involved in an accident, and he asked Kroesser where his Winnebago was located. Kroesser replied that it was parked in the A1A Campground in Sanford but "don't tell Queen."

Bronson then turned Kroesser over to Secret Service agents Connelly and Stronko. The agents informed Kroesser of the true nature of their investigation and that they had the uncut sheets obtained from Queen. Kroesser refused to speak to them without an attorney, so they took him to the Seminole County jail to await his appearance before a federal magistrate.

Once Kroesser was in jail, Agent Connelly asked a police officer to telephone Harmon and tell him that Kroesser had been arrested on assault charges and wanted Harmon to come to the police station to arrange for his bail bond. Connelly had planned to speak to Harmon when he arrived. However, when Harmon inadvertently learned that Kroesser was being held at the county jail, he went directly to the jail, thus avoiding Connelly. There he learned that Kroesser was being held on federal charges.

Once Agent Connelly discovered that Harmon was aware of the true reason for Kroesser's arrest, he along with Agent Stronko and Detective Bronson went to Harmon's home. Agent Connelly told Harmon that Kroesser had been arrested for the theft of uncut currency and asked him if he was willing to cooperate. Harmon said he was, but first wanted to explain his involvement to his wife. The agents agreed. After talking to Mrs. Harmon, he reemerged from the house and accompanied by the law enforcement officers went to the police station. There, Agent Connelly read Harmon his *Miranda* rights, and Harmon confessed, admitting his role in the theft and disposition of the currency. He was then lodged in the Seminole County jail.

A few hours later Agent Connelly, armed with Harmon's confession and Queen's statement, obtained a warrant to search Kroesser's Winnebago. A search disclosed the strongbox with a large quantity of cut and uncut currency, and an envelope containing additional currency. The search also disclosed some narcotic paraphernalia. Consequently, the Sanford police impounded the motor home.

At 10:00 a.m. on the 28th, after conducting the search, the Secret Service agents took Kroesser and Harmon from the county jail to their office in Orlando for processing. In route, Kroesser attempted to reassure Harmon that everything would be all right, at which time Harmon informed him that he had already given a statement to the agents. At the Secret Service office, Kroesser and Harmon were separated for processing. While Agent Stronko was taking his fingerprints, Kroesser broke down and tearfully voiced his regrets at having gotten Harmon involved. Agent Stronko then suggested that Kroesser tell the truth and cooperate with the investigation. Kroesser responded that he was willing to make a statement.

Agent Connelly reminded Kroesser that he had previously asked for an attorney, and inquired whether he wanted to waive an attorney's presence. Kroesser said that he did. Connelly once again read Kroesser his *Miranda* rights, and gave Kroesser the advice-of-rights form to read. Connelly then asked him if he still wanted to make a statement. Kroesser said that he did, and signed a form waiving his right to an attorney. He proceeded to give a full account of the currency theft and the circumstances surrounding it.

During Kroesser's narration the agents learned, for the first time, that Kroesser had hidden some of the stolen currency in two suitcases stored in a mini-storage facility in Sanford. They asked Kroesser if he would consent to a search of the locker. Connelly advised him of his right not to consent. Kroesser responded that he was aware of his rights from his law enforcement experience with the Bureau, and signed a consent form to allow the agents to search. He provided them with the location of the storage facility, the locker number and the combination of the padlock. Agent Stronko executed the search and seized two suitcases containing more than $104,000 in stolen currency.

On May 5, 1982, a federal grand jury returned the two-count indictment in this case. Each count charged that Kroesser aided and abetted by Harmon concealed and retained stolen property of the United States in violation of 18 U.S.C. §§ 641, 2 (1982).[4] Count one related to the currency found in Kroesser's storage locker, and count two related to the currency found in his Winnebago motor home.

In a joint trial that began on August 11, 1982, Harmon and Kroesser were found

---

**4.** 18 U.S.C. § 641 (1982) provides:
 Public money, property or records
 Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
 Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—
 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.
 The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.
 18 U.S.C. § 2 (1982) provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

guilty as charged. Each defendant received the maximum sentence allowed by law on count one: ten years imprisonment and a $10,000 fine. On count two they were given ten year prison sentences, to run concurrently.

## II.

The appellants present five claims of error on appeal. Appellants' first claim is that the evidence was insufficient as a matter of law to support their convictions and that they are entitled to judgments of acquittal. Appellants' remaining claims involve errors that they contend entitle them to a new trial. Both appellants contend that the trial court's jury instruction that the value of the Federal Reserve Notes identified in the indictment was the face value of these notes amounted to a directed verdict on the issue of value. In addition, Harmon claims that he was entitled to a separate jury instruction, and explicit jury finding, on the issue of value. Harmon also asserts that he was prejudiced by the admission into evidence of Kroesser's post-arrest statement in violation of Harmon's sixth amendment rights as set forth in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Finally, Kroesser claims that his fifth amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), were violated by the actions of the Sanford police in eliciting information from him after he requested an attorney.

## A.

### 1.

■ Appellants first raise the claim that the government failed to prove an element of the 18 U.S.C. § 641 offense, as that offense was presented in the indictment.

The indictment alleged that Kroesser, aided and abetted by Harmon, "did conceal and retain stolen property of the United States" in violation of 18 U.S.C. §§ 641 and 2. Appellants point out that the only reference to property in the text of section 641 is to "property made or being made under contract for the United States or any department or agency thereof." Further, they note that there was no proof at trial that the currency in question was being made under contract for the United States or any of its agencies. The government contends that its use of the word "property" encompassed the term "thing of value" as used in the statute, as a category of objects which if stolen would constitute a violation of section 641. *See supra* note 4.

This very issue has been previously addressed by the predecessor to this court.

The current statute makes it an offense to steal a "thing of value *of*" (emphasis added) the United States. The word "of" necessarily implies ownership. Things "of" the Government, in the sense of the statute, are property of the Government. Hence an indictment charging theft of property of the Government constitutes full notice of a charge of theft of a thing of value of the Government. Moreover, the title of the statute under which [the defendant] was indicted reads "Public money, *property* or records" (emphasis added).

Indictments must be read for their clear meaning, and convictions should not be reversed because of minor deficiencies which do not prejudice the accused.

*United States v. Gordon*, 638 F.2d 886, 889 (5th Cir. Unit B 1981), *cert. denied*, 452 U.S. 909, 101 S.Ct. 3038, 69 L.Ed.2d 411 (1982) (citations omitted).[5] Accordingly, the government was not required to prove that the currency at issue was made under contract to the United States.

---

5. In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

2.

Appellant Harmon also claims that the evidence was insufficient to sustain his conviction for aiding and abetting in the retention and concealment of the stolen currency, because there was no showing that he knew that Kroesser had moved the currency to his motor home and to a mini-storage locker. Our standard of review of this claim is whether a reasonable jury could have concluded that the evidence established guilt beyond a reasonable doubt. *United States v. Vera,* 701 F.2d 1349, 1356–7 (11th Cir.1983).

 In order to convict a defendant of aiding and abetting the commission of a crime, the government must show that the accused "was associated with the criminal venture, participated in it as something he wished to bring about, and sought by his action to make it succeed" *United States v. Martinez,* 555 F.2d 1269, 1272 (5th Cir. 1977) (citations omitted) [6]; *United States v. Smith,* 700 F.2d 627, 632 (11th Cir.1983). It is necessary that the government show that the accused shared in the principal's criminal intent as to all the necessary statutory elements of the offense. *See United States v. Longoria,* 569 F.2d 422 (5th Cir. 1978) (accused aider and abettor in scheme to possess and distribute narcotics must be shown to share intent to distribute); *United States v. Short,* 493 F.2d 1170 (9th Cir.), *cert. denied,* 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974) (accused aider and abettor in armed bank robbery must know that the principal is armed).

 Harmon is mistaken in his assertion that he had to have known the location of the stolen currency in order to be convicted of aiding and abetting in the retention and concealment of the stolen currency. All that the government needed to prove was that he shared in Kroesser's intent to conceal the currency. There was ample evidence on the record from which a jury could conclude that Harmon shared the intent to conceal the stolen currency. Harmon had previously helped Kroesser steal the currency; Harmon had shared in the proceeds of laundering the currency; Harmon had spent some of the currency; and Harmon had recovered some of the currency which his son had stolen from Kroesser's safe, and returned it to Kroesser. Thus, the evidence was more than sufficient for the jury to find that Harmon aided and abetted Kroesser in violating 18 U.S.C. § 641.

B.

The maximum penalty to which Kroesser and Harmon were subject under 18 U.S.C. § 641 varied markedly, depending on whether the "value" of the thing concealed was greater than one hundred dollars. *See supra* note 4. The statute itself states that "[t]he word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater." The trial court gave the following instruction to the jury on value. "The term value as used in these instructions means the face value which is inscribed on the Federal Reserve notes which are the subject matter of Counts One and Two, or the market value of those notes, whichever is higher." The district court was attempting to lift language from the statute to inform the jury accurately what it was they were required to decide. Defense counsel objected at the time and now argues that the jury instruction was erroneous in that it mandated a finding of value of at least face value and thus constituted a directed verdict on the issue of value. We agree that the instruction was erroneous. However, we are convinced that it was harmless error.

Though the statute itself defines "value," its definition is less than unequivocal.

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Section 641 lists five measures of value: face value; par value; market value; wholesale cost; and retail cost. It then instructs that "the greater" is to be chosen. Greater cannot mean greatest in a comparison of five alternative measures. It can, however, mean greatest in a comparison of two measures, which is what we believe the framers had in mind in crafting this language. The first three measures of value, face, par, and market, are each alternative measures of value in exchange. The final two measures, wholesale and retail cost, are alternative measures of value as measured by the cost to the government of creating or acquiring the stolen objects. The meaning of the statute's use of "greater" is to preclude a limitation on the definition of value to either solely an exchange notion of value or solely a cost notion. This wider definition of "value" is useful in resolving questions in relation to objects stolen from the government. The federal government is unique in that it has the power to print money, which means it can take a thing of nominal intrinsic value, paper, place its imprimatur upon it and turn it into a valuable commodity, currency.

It is not appropriate, however, to infer that the word "greater" was intended to convey the message that the greatest of face, par and market value should be chosen. When section 641 was amended its language was made to conform in part with 18 U.S.C. § 2311 (1982) by adding the words "face, par, or." *See* 18 U.S.C. § 641 (1982) Historical and Revision Notes. Section 2311 provides the definitions for the terms used in chapter 113, Stolen Property, 18 U.S.C. §§ 2311–2319 (1982). It states: " 'Value' means the face, par, or market value, whichever is the greatest." Congress, rather than simply appropriating the language wholesale, retained the use of the word "greater" rather than "greatest" in section 641.

How then is the choice between alternative measures of value in exchange to be made? If Congress did not intend that the "greatest" be automatically chosen, logic compels that the court instruct, and the finder of fact employ, the most reasonable and appropriate measure under the circumstances. The alternatives of "face," "par," and "market" value may each be a truer, and therefore more appropriate, measure of exchange value depending on the circumstances.

■ It is "well recognized that the question of value in a § 641 proceeding is within the province of the jury rather than that of the sentencing Judge." *United States v. Devall*, 462 F.2d 137, 142 (5th Cir.1972). In the case before us the trial court did permit the jury to make a finding on the issue of value. However, its instruction was erroneous on how the jury was to determine value. The district court's instruction that the value was the greater of face value or market value effectively precluded a finding of value by the jury less than face value. Since there was no dispute that the currency in question had a face value over $100,000, the issue of whether the value of the currency was over $100 was effectively foreclosed.

■ There was a great deal of testimony at trial to the effect that if the federal government knowingly received this currency it would not honor it, since it did not issue it; in effect it would treat it as counterfeit. Therefore, it is correct to note, as Kroesser does, that the face value could not *per se* have been the value of the currency, as it would have been were we dealing with authentic and valid, stolen currency. The only role that the face value of the stolen currency could have performed was as an upper limit of the market value of the currency. *See, e.g., United States v. Wright*, 661 F.2d 60, 61–62 (5th Cir. Unit B 1981). The proper value of this currency was what it would have garnered on the market. *Devall*, 462 F.2d at 143 n. 16. Therefore, the trial court's jury instruction on value was erroneous. The only remain-

ing question is whether this error was harmless.

At the time of the indictment, two hundred thousand dollars of currency stolen from the same source had already been passed at 40% of its "face value" in a thieves market. In addition, Kroesser and Harmon admitted passing some $16,000 of the currency at face value. There was expert testimony at trial that approximately 90% of the seized currency was similarly facially perfect. There was no evidence at trial disputing any of the above. The only evidence that the defense elicited on the question of value was that the United States government would not honor the currency if it knew it was not properly issued.

Since the face value of the currency was over $100,000, and 90% of it was facially flawless and could be converted at a 40% rate, the reasonable market value that a jury could have found was $36,000. This figure is three hundred sixty times as great as the one hundred dollar amount required by the statute to permit the imposition of the sentence appellants received. It is inconceivable to us that the improper jury instruction in any way prejudiced appellants. Therefore, we find it to be harmless error. *See Mason v. Balkcom,* 669 F.2d 222, 227 (5th Cir. Unit B 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983) ("where the evidence of guilt is so overwhelming that the error could not have been a contributing factor in the decision to convict," an erroneous jury instruction is harmless error).

### C.

■ Appellant Harmon claims that the court should have required the jury to make a separate finding of value as to him, and that a failure to make such a finding leaves open the possibility that the value of the currency with respect to Harmon was less than one hundred dollars. This argument misconstrues the requirements to obtain a conviction for aiding and abetting under 18 U.S.C. § 2 (1982).

The district court's jury instructions were clear. It instructed the jury that: (1) in order to convict Harmon, the jury first had to find Kroesser guilty of the section 641 offense; and (2) that in order to convict Kroesser they had to find that the concealed notes had a value in excess of one hundred dollars.

In order to sustain a conviction for aiding and abetting, the evidence must show that defendant was associated with the criminal venture, participated in it as in something he wished to bring about, and sought by his action to make it succeed.

*United States v. Martinez,* 555 F.2d 1269, 1272 (5th Cir.1977) (citation omitted). Value is not a separate element of the offense of aiding and abetting. Proof that Harmon aided and abetted Kroesser in violating section 641 was all that was required for a conviction. Therefore, the jury was not required to make a separate finding of value as to Harmon.

### D.

Harmon's final claim is that the admission of Kroesser's statement at their joint trial violated his constitutional right to confront Kroesser. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

■ The Supreme Court has carved out an exception to *Bruton* in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). When two codefendants each confess to a crime and each confession implicates the other, and the two confessions interlock such that the salient facts against the first defendant that appear in the confession of the second defendant also appear in the confession of the first, and vice versa, then each confession is admissible in full against the maker thereof at a joint trial. *Id.* at 72–74, 99 S.Ct. at 2138–39.

■ Harmon argues that since Kroesser's statement went beyond Harmon's as

to the location of the stolen currency, it did not interlock on this crucial issue and therefore should have been excluded as to Harmon. As our discussion in part II.A. *supra* makes clear, the location of the stolen currency was not a statutory element of the crime with which Harmon was charged. Therefore, the admission of Kroesser's confession passed the test of *Parker v. Randolph.*

### E.

In the district court Kroesser sought the suppression of his statements regarding the location of the motor home made to Detective Bronson and the confession he gave to Agent Connelly. In addition, Kroesser sought to suppress the notes seized both from the motor home and the mini-warehouse. The location of the motor home was obtained as a result of a ruse Bronson employed after Kroesser had requested an attorney. The confession to Connelly was likewise obtained after Kroesser had requested an attorney. Kroesser argues that the currency found at both locations are each the fruit of a poisonous tree, in that they were found as a result of information gleaned from unconstitutional interrogations.

### 1. The Winnebago.

Believing that the motor home might contain the strongbox in which more stolen currency was hidden, Agent Connelly had Detective Bronson ask Kroesser for its location though Kroesser had indicated his refusal to speak without an attorney. Kroesser revealed the location after being told that the information was needed to investigate an accident, which, of course, Bronson fabricated. The questioning violated Kroesser's fifth amendment rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ There is a principle of constitutional law that evidence *seized* in a facially constitutional manner, that was *discovered* as the result of a constitutionally flawed practice, is in effect tainted fruit of a poisonous tree and is not admissible. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Therefore, though an otherwise valid search warrant was procured to search Kroesser's motor home, since its location was obtained as a result of a *Miranda* violation, the currency

discovered in the motor home was perhaps inadmissible.

■ The Supreme Court has seen fit to carve out an exception to the "fruit of the poisonous tree" doctrine. When there is a reasonable probability that the law enforcement officers would have inevitably discovered the challenged evidence, the evidence will not be excluded solely because it was the tainted fruit of an unconstitutional inquiry. *Brewer v. Williams,* 430 U.S. 387, 406 n. 12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 424 (1977); *United States v. Roper,* 681 F.2d 1354, 1358 (11th Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983).

■ The district court described as "inconceivable" that Bronson and Connelly would not have promptly found the location of Kroesser's motor home by following the leads provided by Queen and by questioning Harmon and employees of Harmon's and Kroesser's saloon. We are less sanguine that that approach would have necessarily yielded any positive results. Kroesser was attempting to hide from Queen; hence it is not obvious what leads she could have provided. Nor is there any evidence in the record that either Harmon or any of the employees at the tavern knew of the location of the Winnebago. Nonetheless we are compelled to agree with the district court that the police would have inevitably discovered the location of the Winnebago. A motor home is a very large object, and though it could be concealed, it was not. Kroesser had simply moved it to the A1A Campground in Seminole County. This is undoubtedly one of the first places the police would have investigated in a blind search for the motor home. Thus we find that its location falls well within the exception we articulated in *United States v. Roper,* and the evidence seized from it was properly admitted at trial.

### 2. Kroesser's Confession and the Contents of the Storage Locker

■ Kroesser next contends that his confession and the location of the storage locker in which he had secreted two suitcases of Federal Reserve Notes were obtained in violation of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and that therefore the confession and the notes taken from the suitcases should have been suppressed.

The defendant in *Edwards* had requested an attorney, at which time questioning was suspended. The following day, while still in jail, the police told the defendant that "he had" to talk. The Supreme Court held:

> that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.* 451 U.S. at 484–85, 101 S.Ct. at 1884–85 (footnote omitted) (emphasis added).

Recently, the High Court in *Oregon v. Bradshaw,* —— U.S. ——, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) has provided a fuller explanation of what constitutes a defendant-initiated conversation. Bradshaw had requested an attorney, and his interrogation had been terminated. Later, while in police custody, he asked a police officer "Well what is going to happen to me now?" The officer responded that Bradshaw had requested an attorney and that he didn't have to talk. They then discussed where Bradshaw would be taken and offense for which Bradshaw had been arrested. The officer suggested that Bradshaw take a polygraph. Bradshaw agreed. The next day the police obtained a waiver of Bradshaw's *Miranda* rights, administered a polygraph, and later obtained a confession. The Supreme Court ruled that though "some inquiries, such as a request for a drink of water or a request to use a telephone," 103 S.Ct. at 2835, would not satisfy the criterion of "initiating" a conversation, where the defendant "evinced a willingness and a desire for a generalized discussion about the investigation," *id.,* the *Edwards* proscription requiring exclusion of the evidence would not apply.

If the ambiguous and unfocused inquiry "what's going to happen to me now?" demonstrated sufficient willingness on Bradshaw's part for a generalized discussion about the investigation, then there can be no doubt that Kroesser's far more pointed expression of regret, voiced to Agent Stronko during fingerprinting, that he had involved Harmon in criminal activity, clearly constituted an initiation of a discussion about the investigation. After Kroesser reopened the discussion Agent Connelly was scrupulously careful not to interrogate him until he had obtained a valid waiver of Kroesser's *Miranda* rights. We therefore have no difficulty in concluding that both the confession and the fruits of the confession were obtained without violating *Edwards v. Arizona.*

### III.

Finding no merit in any of appellants' claims, the convictions are

AFFIRMED.

### ON PETITION FOR REHEARING

PER CURIAM:

The petition for rehearing is DENIED with the following observations.

Since the panel opinion was handed down, the United States Supreme Court has decided *Nix v. Williams,* —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In that opinion the Court approved the "inevitable discovery" exception to the exclusionary rule, couching it in the following language:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means--here the volunteers' search--then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense. *Id.* at ——, 104 S.Ct. at 2509 (footnote omitted).

We do not find this formulation of the inevitable discovery exception to affect our disposition of this case.